UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    CRIMINAL NO. 3:20CR07 (JCH)

v.

CHAIM STERN                                 April 14, 2021

## MEMORANDUM IN AID OF SENTENCING

Chaim Stern ("Stern") faces sentencing for fraudulently diverting money intended for the benefit of his nursing homes' employees and the U.S. Treasury, and instead sending it to a number of other places that had no right to it.  One of those recipients, especially later in Stern's scheme, was certainly his nursing homes' operating accounts, as he struggled to keep them afloat after years of mismanagement.  But much of that money went elsewhere, and in particular to an alleged charity (Em Kol Chai) solely controlled by Stern, which in turn supported a number of other causes important to Stern.  Indeed, Stern did not use the money he stole to live an extravagant life, but instead to maintain his station and reputation as an important benefactor within his community. More than anything, this desire to maintain his importance appears to have taken on singular focus for Stern, at the expense of honoring his commitments to others, principally his employees, who depended on him.  And, while Stern has been able to make significant restitution—in part because of good fortune in his life settlement investments and in part because of his community's beneficence—there is no evidence at the time of his crimes that he had any intention of repaying the money he stole.  Indeed, when confronted with his crimes, Stern's initial reaction was to lie and obfuscate, claiming to authorities that he had no connection to Em Kol Chai.  Thus, while the Court should of course credit his efforts toward restitution, it should be mindful that (like so many

others) making his victims whole was certainly not his first inclination. Ultimately, viewing his crime as a whole, and considering both his obstructive conduct on the one hand and his acts of kindness on the other, a meaningful sentence of imprisonment is warranted. The Court's sentence should reflect the seriousness of Stern's betrayal of his employees and his lies to authorities, while being mindful of the complexities of his motives and his personal history and circumstances.

## I.   <u>INTRODUCTION AND BACKGROUND</u>

On January 15, 2020, the defendant appeared before United States Magistrate Judge William I. Garfinkel, waived indictment, and pleaded guilty to a three-count information charging violations of 18 U.S.C. § 664 (theft or embezzlement from employee benefit plan); 18 U.S.C. § 669 (theft or embezzlement in connection with healthcare); and 26 U.S.C. § 7202 (willful failure to pay tax). The defendant's guilty plea was entered pursuant to a plea agreement that, among other things, included a Guidelines stipulation that calculated the applicable range at 70 to 87 months' imprisonment, a fine of $25,000 to $250,000, and supervised release of 1 to 3 years. The defendant also waived appeal so long as his sentence does not exceed 87 months' imprisonment, 3 years' supervised release, and a $250,000 fine, and restitution in any amount ordered by the Court.

The plea agreement called for restitution of at least $4,103,828 to the Bridgeport Health Care Center Retirement Plan, to be offset by any recoveries following discovery of the criminal conduct. The defendant further agreed to pay restitution for all health claims that remain unpaid by the Bridgeport Health Care Center Health Plan, regardless of whether the payee is a victim of the count of conviction. Finally, the defendant is obliged under the plea agreement to make restitution to the IRS in the total amount of $2,461,372.10.

The defendant has been at liberty throughout the pendency of this case on a $500,000 unsecured bond, co-signed by his three sons-in-law.  PSR ¶ 4. The defendant has been compliant with the terms of his release.  PSR ¶ 4.

## II.   FACTS AND CIRCUMSTANCES OF DEFENDANT'S CONDUCT

The PSR accurately summarizes the defendant's offense conduct, and the Government requests that it be adopted by the Court as its findings of fact.  Following is a summary based on the PSR.

Stern controlled three nursing homes—Bridgeport Health Care Center Inc. (hereinafter "BHCC") in Bridgeport, Connecticut; Bridgeport Manor, a separate facility on the same site as BHCC; and Rosegarden Health and Rehabilitation Center LLC ("Rosegarden") in Waterbury, Connecticut.  PSR ¶ 6.  As described below, Stern stole from the BHCC pension plan; he diverted money from the BHCC health plan; and he willfully failed to have the nursing homes pay millions of dollars in employment taxes that they collected.

### A.  Theft From The Pension Plan

#### 1.  Stern Stole Over $4 Million From the Plan

BHCC maintained a Pension Plan for the benefit of its employees, which was a negotiated benefit under its collective bargaining agreement.  PSR ¶¶ 7-11.  As of the end of 2008, Stern was the sole trustee for the Pension Plan, PSR ¶ 8, and was responsible for all finances of the Pension Plan.  PSR ¶ 13.  As trustee, Stern was prohibited from self-dealing, and was required to put pension money in investments with a ready market.  PSR ¶¶ 9-10.  The Pension Plan issued a summary plan description for its employee participants that, in part, promised that funds would be invested in a "diversified portfolio which may include savings and/or money market accounts,

stocks, bonds, mutual funds and insurance company funds." PSR ¶ 10. Participants were certainly not told that their money would be sent to a charity that Stern controlled for the benefit of Stern's community.

Notwithstanding his fiduciary obligations as trustee, beginning in January 2011, Stern fraudulently converted Pension Plan assets from legitimate investments into a "charity" that he controlled, known as Em Kol Chai ("EKC"). PSR ¶ 14-16. Between January 2011 and August 2013, Stern converted an aggregate of $3.8 million from the Pension Plan to EKC. PSR ¶ 15. Far from being a legitimate investment vehicle, Stern then moved money from EKC (including money taken from the Pension Plan) to (1) Stern's own accounts and credit cards; (2) nursing facilities controlled by Stern, including Bridgeport Manor and Rosegarden; (3) other purported charities or causes controlled by Stern, including American Friends of Viznitz in Israel; (4) companies that do not appear to have significant, if any, actual business operations; (5) other individuals, including a relative of Stern; and (6) insurance policies on the lives of Stern, his family and other associates. PSR ¶¶ 17-21. Some transfers appeared to be short term loans, although none that yielded investment gains, that is, they did not charge interest. PSR ¶ 22.

In addition to the money moved through EKC, Stern also directly converted just over $300,000 from a Washington National annuity, owned by the Pension Plan, to the nursing homes and related entities. PSR ¶ 23.

In total, Mr. Stern fraudulently converted to his use and the use of others $4,103,828 from the BHCC Pension Plan. PSR ¶ 24.

2.   <u>Stern Tried to Conceal His Theft</u>

In order to hide his theft from the Pension Plan, Stern signed multiple annual Forms 5500 (required filings to the U.S. Department of Labor for employee benefit plans) that contained false and/or misleading statements related to the funds transferred to EKC. In short, the Forms 5500 initially failed to disclose the transfers to EKC, but later falsely claimed that the money sent to EKC was a loan.  PSR ¶ 25.

First, Stern's 2011 Form 5500 hid the substantial transfers he had made to EKC by misleadingly reporting cash of over $2.7 million, in large part relying on a check from an entity called Point Developers.  More specifically, on September 29, 2011, the Pension Plan's account balance was only $108,277.  PSR ¶ 26.  On September 30—the year-end date for purposes of filing the Form 5500—a $2.6 million check from Point Developers was deposited into the Pension Plan account.  PSR ¶ 26.  A week later, that check bounced, leaving the Pension Plan's cash balance at just over $100,000, which was a more accurate picture of the Pension Plan's cash position given the diversions to EKC.  PSR ¶¶ 26-28.  On July 12, 2012, Stern filed the 2011 Form 5500 for year ending September 30, 2011, and misleadingly reported that the Pension Plan had a cash balance of over $2.7 million.  PSR ¶ 26. The Form 5500 also falsely denied "any nonexempt transactions with any party-in-interest" and did not report its transfer of money to EKC, of which Stern was the president.  PSR ¶ 27.

Stern first reported the Pension Plan's transfer of money to EKC on his 2012 Form 5500, declaring a "loan" to EKC among other investments.  PSR ¶ 29.  In November 2013, Stern amended the 2012 Form 5500 with an auditor's report containing more information on the alleged loan.  The auditor's report falsely claimed that "[i]n October 2011 Bridgeport Health Care Center

Inc Retirement Plan entered into a promissory note for $3,800,000 with EKC. Interest was set at 3.25% and is payable semi-annually. The note matures on October 1, 2014 with an option to renew for an additional two years. Of the $3.8M amount only $3,298,000 was provided and $60,018 was repaid." PSR ¶ 30. That loan was likewise reported by Stern in the 2013 Form 5500. PSR ¶ 31. Both the 2012 and 2013 forms continued to deny falsely the existence of "nonexempt transactions with any party-in-interest." PSR ¶¶ 29, 31.

However, the November 2013 auditor's report was false. There had been no promissory note in October 2011, and the money taken from the Pension Plan was never intended as a loan. Instead, the promissory note was created in July 2013—and backdated to October 2011—in an attempt to justify the money that Stern had taken. PSR ¶ 32. The draft promissory note was recovered from a BHCC computer during the execution of a search warrant at the BHCC premises in May 2018. According to its metadata, Stern's son created the draft promissory note on July 3, 2013, and he then emailed the draft to Stern. Shortly thereafter Stern consulted with accountants regarding this "promissory note." On July 5, 2013, Stern's accountant suggested that there needed to be security for the loan and suggested using the "assets of Em Kol Chai." However, Stern responded "What assets? I don't thing [sic] it has any meaningful assets in their name." Stern also noted they could not mortgage his "cong[regation]" because it needs "[Attorney General] approval." PSR ¶ 32.

Later, on December 12, 2014, Stern, through BHCC counsel, submitted the fraudulent promissory note, purporting to have been signed on October 3, 2011, to the Department of Labor-Employee Benefits Security Administration ("DOL-EBSA") in response to a subpoena in DOL-EBSA's civil investigation of the Pension Plan. In order to create the illusion that Stern had nothing

6

to do with EKC and that this purported loan was a legitimate arms-length investment, the promissory note purported to have been signed on behalf of EKC by an associate of Stern's, though that person had no control over EKC's finances. As discussed above, Stern controlled EKC, and he and his son devised the note.  PSR ¶ 33.

       3.   <u>Stern Lied To Investigators</u>

Stern was interviewed on multiple occasions by DOL investigators in the civil case, and again attempted to hide his theft.  PSR ¶ 34.

First, on November 18, 2013, Stern falsely claimed to DOL investigators that he did not know the nature of EKC's business.  He claimed he agreed to loan it over $3 million after meeting with people from EKC that he knew from Brooklyn, because it promised to pay a good interest rate.  However, he did not produce any loan documentation, and claimed not to know the first names of the EKC representatives.  As the civil investigation continued, Stern again lied to DOL investigators in an interview on May 13, 2015.  He continued to falsely claim he had no business or personal connection to EKC.  Only when he was confronted with contrary evidence did he concede that he "may have been" an officer and founder of EKC, but maintained he had resigned years ago.  He both denied knowing who drafted the promissory note, and then claimed the loan was his idea because it was a good investment.

Although Stern initially told DOL investigators had no connection to EKC, and then later claimed he had resigned from EKC by 2008, bank records show that he continued to hold himself out as president of EKC well after 2008. For example, in August 2017, Stern opened a new bank account in EKC's name at TD Bank and signed his name as President of EKC.

4.  Repayment and Civil Settlement

As discussed in the PSR, Stern has effectively repaid the stolen principal to the Pension Plan.  PSR ¶¶ 36-41.

**B.  Theft From Health Care Plan[1]**

1.  Stern Failed to Pay Claims Despite Commitments to Employees

Pursuant to collective bargaining agreements with two unions, BHCC was required to provide health insurance benefits to active employees.  PSR ¶ 42. Effective October 1, 2010, the BHCC provided that coverage through a self-funded plan (the "Health Plan").  The Health Plan was funded out of general assets and BHCC withdrew a specified amount from participating employees' paychecks to offset the cost.  PSR ¶¶ 43-44.   BHCC also maintained stop-loss insurance coverage for claims that exceeded certain thresholds. Between October 1, 2011 and September 30, 2015, BHCC maintained such stop-loss coverage through Zurich American Insurance Company ("Zurich").  PSR ¶ 45.

BHCC contracted with third parties to administer the Health Plan. PSR ¶ 46. Stern was responsible for either funding a BHCC Reimbursement Account from which the administrator could pay claims or sending payment directly to the administrator so that administrator could pay the claim from its own account. PSR ¶ 46. On three occasions, BHCC was forced to retain a new administrator because their then-existing relationship was terminated, typically for Stern's failure to fund the health claims or pay administrative fees. PSR ¶¶ 46-52.  As a result, during the relevant period, BHCC worked with four different administrators—United Medical Resources ("UMR"),

---

[1] Stern pleaded guilty to the theft of a particular Health Plan asset (just over $300,000 in stop-loss insurance proceeds), but agreed in the plea agreement that the Government would submit additional relevant evidence as to Stern's running of the Health Plan and ask that it be considered under 18 U.S.C. § 3553.  The PSR summarizes that additional evidence.

Meritain Heath Inc., American Plan Administrators, LLC ("APA"), and Benefit & Risk Management Services, Inc. ("BRMS").  PSR ¶¶ 46-52.

Notwithstanding their repeated failure to pay healthcare claims between 2010 and 2018, and significant balances of unpaid claims, Stern and BHCC continued to represent to both plan participants (principally BHCC  employees and their families) as well as the third-party administrators that BHCC would pay claims. As a result, participants and families continued to seek medical care and accrue charges with the false expectation that they would be covered by the Health Plan. In truth, Stern knew that he would not have the ability to pay those claims.  PSR ¶ 53.

As discussed below, there are approximately $9,436,114.78 in employee health claims that remain unpaid. Many of these employees, who were misled into believing that their medical expenses would be paid through the Health Plan, have been subjected to debt collection efforts by the health care providers. Because Stern did not pay the claims, the health care providers have been trying to collect payment directly from the employees, even resorting to the use of debt collectors and obtaining civil judgments against the employees.  PSR ¶ 55; PSR Third Addendum.

2.  Stern Covered Ineligible Individuals

In part, Stern's inability to pay claims emanated from his use of the Health Plan to cover ineligible individuals, typically members of his own extended family. Stern represented to plan participants that the Health Plan would only cover eligible individuals. For example, the UMR summary plan document—similar to all other summary plan documents that BHCC issued—represented that the plan only covered Eligible Employees, defined as: "[A] person who is classified by the employer on both payroll and personnel records as an Employee who regularly works full time at least 24 or more hours per week, but for purposes of this Plan." The Health Plan

does not cover "a member of the employer's Board of Directors, an owner, partner, or officer, unless engaged in the conduct of the business on a full-time regular basis." The Health Plan covers a spouse and dependents of the eligible employee, but does not cover any other relative. PSR ¶ 56.

Despite representing to BHCC employees that the Health Plan would only cover eligible employees and their dependents, in truth Stern covered many more. Over the relevant time period, he covered approximately 50 additional people who had no employment at the BHCC. For those 50 ineligible individuals, the Health Plan paid $789,992 in claims, $155,019.11 in extra stop loss premiums, and $37,056.29 in additional administrative fees. Coverage of those additional individuals also contributed to the failure of the Health Plan, in that many of those additional individuals' claims were not paid, contributing to the arrears that led to successive third-party administrators terminating service contracts. Moreover, unlike employee participants who funded the Health Plan through salary deductions, these ineligible non-employees did not contribute anything to the finances of the Health Plan, even as they drained BHCC's resources that could otherwise be used to pay its legitimate health claims and other bills. PSR ¶ 57.

### 3.   The Charged Conduct – Theft of Plan Assets (Stop Loss Claim)

The Information specifically charges one particular theft from the Health Plan. In late 2014 and early 2015, the spouse of a covered BHCC employee incurred significant medical expenses at Yale New Haven Hospital. On February 10, 2015, UMR drafted a check against the Reimbursement Account in the amount of $305,608.06 payable to Yale New Haven Hospital. Because the payment amount was significantly high, UMR held the check for advance funding under the Zurich stop-loss policy. PSR ¶ 58.

On February 24, 2015, Zurich issued three checks payable to Bridgeport Healthcare Center c/o UMR, totaling $312,087.94, to specifically pay the claim mentioned above.  BHCC deposited the three checks into a BHCC operating account on or about February 27, 2015. PSR ¶ 59. However, instead of paying the health care claim, Stern directed that the money be sent to several other places.  PSR ¶¶ 60-69.  Specifically, money was transferred to Bridgeport Manor, a BHCC payroll account, a nurse staffing agency, an insurance premium financing company, and an account in the name of Stern and his wife (which in turn was transferred to EKC and to pay off a short term loan).  PSR ¶¶ 60-65.  UMR eventually sent Yale the check, but it bounced.  PSR ¶ 66.  BHCC instructed it to resend the check, and it bounced again.  PSR ¶ 68. UMR resigned as administrator shortly afterwards, with over one million dollars in claims processed by UMR on behalf of BHCC employees that remained unpaid by BHCC.  PSR ¶ 69.

    4.  <u>Total Unpaid Claims</u>

As part of a settlement of federal civil lawsuits filed by the DOL and the union representing BHCC employees against Stern and BHCC, Judge Dooley entered a civil consent judgment regarding the unpaid health care claims.  PSR ¶¶ 38-39, 70.  The civil consent judgment defined "unpaid claims" as "claims that were covered by the Health Plan but were not paid by the Health Plan from February 4, 2013 (billing date) through July 4, 2018 (service date) including, but not limited to, claims which participants and beneficiaries paid out-of-pocket (excluding co-pays, coinsurance, and deductibles) and which participants and beneficiaries submit for payment upon notice from the Claims Administrator or otherwise in the Claims Administrator's discretion." PSR ¶ 70. For purposes of this criminal case, the Government believes that unpaid claims should be

calculated based on claims accrued (*i.e.*, date of service) until May 15, 2018, which is the last day before BHCC was taken over by a bankruptcy trustee.  PSR ¶ 70.

In total, approximately $9,436,114.78 in health claims remain unpaid, as explained in the PSR.  PSR ¶¶ 70-74.

According to the civil settlement, over the next several months a claims administrator will attempt to satisfy the remaining unpaid claims using $1.5 million paid by Stern, $1 million provided by BHCC's insurance, and $26,392.15 paid by BHCC.  PSR ¶¶ 75-76.  In the interim, Judge Dooley has issued an injunction preventing the providers from pursuing collections against Health Plan participants.  *See Stewart v. Bridgeport Health Care Center, Inc. and Chaim Stern*, Civ. No. 3:16-CV-01519 (KAD), ECF No. 179 (D. Conn. March 22, 2021).

### C.  Tax Offenses

As principal operator of BHCC and Rosegarden, Stern had a duty to collect, account for, and pay to the Internal Revenue Service ("IRS") employment taxes collected from BHCC employees.  PSR ¶ 77. From at least January 1, 2017 through and including the First Quarter of 2018, Stern willfully failed to, and willfully caused BHCC and Rosegarden to fail to, pay to the IRS employment taxes they collected from BHCC and Rosegarden employees (the "Employee Portion"). From at least January 1, 2017 through and including the Second Quarter of 2018, Stern willfully failed to, and willfully caused BHCC and Rosegarden to fail to pay BHCC and Rosegarden's share of employment taxes (the "Employer Portion"). The total tax loss resulting from Stern's criminal conduct is $4,356,409.85. PSR ¶ 78.

For guidelines tax loss purposes, Stern is responsible for the employer and employee portion of the employment taxes. However, for restitution purposes, he is responsible for repayment of only the employee (trust) portion.  PSR ¶ 79.

Stern acknowledges that he was repeatedly warned of his obligation to make payments of the above tax obligations and the consequences of failing to do so, to include civil and criminal consequences. The IRS sent Stern, BHCC, and Rosegarden frequent notices of his employment tax deficiencies, which included the many consequences of failing to keep current on his tax obligations. Stern also hired a tax consultant to assist him in meeting his IRS obligation. That consultant repeatedly warned him of the consequences of failing to meet his obligations, particularly paying employee tax withholdings to the IRS. Nonetheless, Stern continued to fail to turn over employee withholdings to the IRS.  PSR ¶ 80.

### D.  Use of BHCC Funds

Stern used BHCC and Rosegarden resources to pay personal expenses for himself and his family, friends and other associates, many of whom were not employees of BHCC. The PSR summarizes certain of those expenses.  These included $43,632 in personal E-ZPass expenses, PSR ¶ 82; $317,120 in gas charges, PSR ¶ 83; $164,364.33 in Verizon cellular expenses and thousands of dollars for personal international calls, PSR ¶ 84; and cars and car insurance, PSR ¶ 85.

The PSR goes on to describe myriad examples of Stern using BHCC and Bridgeport Manor funds to pay various personal bills, often putting the money through a byzantine network of money transfers before it reached its ultimate destination, including moving some of the money through EKC.  PSR ¶¶ 86-95.  Among other things, the money was used to pay personal and commercial

13

loans for Stern or Stern-controlled entities, including Stern's mortgage; make short-term loans; provide money to other religious institutions; pay various personal credit cards; and pay state taxes. *Id*. Stern also frequently used his personal bank accounts, accounts of BHCC and Bridgeport Manor, and other accounts he controlled, including accounts for purported charities, limited liability companies, and partnerships, to move money around in a seeming "shell game." PSR ¶ 96. And Stern used money from BHCC and the Pension Plan (via EKC) to fund premiums for various life insurance policies he purchased on himself, family members, and others in the community. PSR ¶¶ 97-101.

## III.     SENTENCING GUIDELINES

The Government continues to agree with the Guidelines calculation set out in the plea agreement, and now adopted in the PSR, which determined that Stern's total offense level is 27 and that he falls within Criminal History Category I, resulting in a Guidelines range of imprisonment of 70-87 months, a fine of $25,000 to $250,000, and term of supervised release of 1 to 3 years.

## IV.     A MEANINGFUL SENTENCE OF IMPRISONMENT IS APPROPRIATE

Stern's crimes here are serious and warrant a meaningful term of imprisonment after consideration of the Sentencing Guidelines and § 3553(a) factors, even in light of his personal history and characteristics.

### A.  Seriousness of the Offense, Just Punishment and Respect for the Law

By far the most significant factor that augurs for a meaningful punishment is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553 (a)(2)(A).

1.  Stern Betrayed His Employees

The essence of this defendant's crime—and the foremost reason for punishment here—is the profound breach of his employees' trust.  For many years, Stern made promises that his employees relied on in taking jobs at BHCC, Bridgeport Manor, and Rosegarden.  He assured employees that he would make the required pension contributions and would properly invest that money as well as any voluntary contributions from employees.  And his employees relied upon those promises in making their own retirement plans. These were not otherwise wealthy individuals expecting huge payouts, but dedicated professionals who spent their lives in service to their patients and who expected that their very modest retirement savings would be available to them when it was time to step away from the rigors of nursing home life.  *See* PSR Third Addendum (describing victim impact statements).

Similarly, Stern committed to providing health insurance benefits to his employees and their families, and deducted insurance contributions from their paychecks, and the employees expected that the insurance would be available in their time of need.  Again, Stern's employees relied on his commitments when they sought medical care, in extreme examples accruing tens or hundreds of thousands of dollars in medical bills that they expected to be covered by their insurance.  And Stern continued to make these false promises even as the BHCC house of cards was collapsing around him; he did not just fail to shut down the nursing facilities, but he actively caused his employees to rely on these illusory promises that he *knew* he could never keep.

Although Stern now has made (as to the pension plan) and has taken steps to make (as to the health plan) restitution that will bring relief to many of his employees, their scars will remain.

15

First, many victims have already endured several years without access to pension funds and lived with the uncertainty of whether they would ever be able to enjoy a meaningful retirement all.  For example:

- Victim I.F. wrote: "The past 4 ½ years have been very difficult for me. There isn't a day that passes that I am not overcome by the feeling of anxiety and stress regarding my pension. The stress and worry has taken a physical toll of me – causing sleepless nights and increased anxiety. I have worked so hard and planned for this money to help pay for my health insurance, prescription expenses, and living expenses such as house taxes, utilities, and groceries. I currently have no dental coverage and must pay out-of-pocket for all dental services. I also have some home repairs that I am unable to afford and need the money in order to have them done. I am in desperate need of this money to make ends meet. I am begging you to please pay out on my retirement account, which I worked so hard for, as soon as possible."

- Victim L.J. wrote: "I am expressing the impact on my life after not being able to receive my pension when I thought I would.  All of my family retirement plans came to a halt, my not getting my money denied me the opportunity to carrie (sic) out things as previously planned. … Personally, I choose to forgive Mr. Stern for what he did to me and my family.  But!  I would like to see him punished to the full extent of the law for what he did to me and many others of work mates."

- Victim H.L. wrote: "This whole situation has been emotionally taxing and financial difficult for my husband and I.  And I can't wait for this entire ordeal to be over

and for me to have my hard earned money returned to me.  And to not have to worry where every penny is coming from."

- Victim A.R. could not get access to the pension for the first six years of retirement, explaining: ""I worked for BHCC for 40 years.  I applied for my pension on December 5, 2015.  As of today I have not received anything."

- Victim L.G. wrote: "After all these years of work and relying on my insurance and my retirement this leaves me in a very difficult position on what my future holds without a pension. This situation has left me in a state of shock, depression and anxiety for my future. I dedicated 32 years to this place and this employer just destroyed our lives and didn't care about his employees."

- Victim C.D. wrote: "I did not make a lot of money but I thought I was going to be able to retire with dignity! I just turned 65 and I am more worried now than I have ever been in my life. How are we going to be able to survive now? It is an awful same that Mr. Stern was able to steal from all of us."

- Victim Le. R. wrote: "I came to this country … to give my children a better life and put them through school. I have sacrificed a lot and when I learned that Mr. Stern stole money from the pension fund I was in tears. I have worked so hard my whole life to have enough money to retire. I had over $50,000 in my pension fund and was counting on that money to help me in my retirement. I am now retired, but I have to clean houses to make ends meet. I had a plan to use the money in my pension to help me live. My plan was to completely retire and spend some time [overseas] with my sick mother, but because I do not have that pension money that I worked so hard to put into, I cannot even do that."

- Victim M.M. wrote: "The loss of my pension has caused much stress in my life.  I worked at Bridgeport Manor for 17 years, and contributed as needed.  I am retired now and living on my social security.  The lack of my pension has caused me to not accomplish the goals for myself and my family upon retirement.  This has saddened me and caused me stress."

Each of these victims will now be made whole financially, but they will never be able to recoup the lost years of their retirement, which involved not rest after a long career, but instead worry, stress, and side jobs.  Nor can Stern make up financially for the very real psychological strain he has caused his employees over the last several years, while they lived with the uncertainty of whether they would ever be able to retire.[2]

Second, the future for employees who still have unpaid medical bills is murkier.  The Government certainly hopes that the claims administrator in the civil case will be able to settle the $9.4 million in unpaid medical claims for the $2.5 million made available to him by Stern, BHCC, and their insurance company.  If that effort is successful, it will end the nightmare endured by employees who accumulated medical bills believing, based on Stern's false promises, that they truly had health insurance.  But, as with the pension victims (some of whom are the same people), the trauma cannot be cured.  Indeed, it is arguably worse, as many of these bills were accrued in difficult, even tragic times for employees.  For example:

---

[2] It is worth noting that while the civil settlement allows for a modest prevailing interest rate, it certainly does not approximate the gains that might have been earned had the pensioners' funds been invested in other vehicles, such as securities.  Put differently, these victims will certainly not share in the stock market's vast gains over the last several years.

- Victim C.C., a union leader, wrote: "I'm one of the lucky ones – [Stern] only stole my pension.  So many of my friends have 4, 5, and 6 figure medical bills through no fault of their own.  Sleepless nights, bill collectors, loss of self esteem – truly terrible."

- Victim A.R. wrote: "Along with not receiving my pension, my health bills were not being covered as I was paying for my health insurance all long.  Until this day I have pending medical bills that were not being covered by my medical insurance."

- Victim Lu.R. wrote: "Life become so much worse when [my husband] passed away April 10, 2015 from his illness. What a horror it was to discover that none of our insurance bills were being paid and I was harassed daily by bill collector's phone calls and past-due notices in my mail. I kept explaining to the bill collector's that I had insurance and my employer would pay the invoices, but they didn't want to hear any explanation and had no sympathy. They just wanted their money! I was paying my premium on a week basis through payroll deduction and when I called UMR (the insurance company) they told me that I didn't have any insurance coverage for our medical expanses because my employer terminated coverage."

- Victim La. R. wrote: "My husband and I went through financial hardship during those years, as my husband was retired and my medical claims and paychecks were not always paid on time by BHCC. Many times, the health insurance company would decline paying our claims citing that I had not paid my premium that month. However, every single one of my paystubs dated from 2006 until 2016 had a health care deduction. We started accumulating debt with hospitals and doctor's offices. Because my husband and I both have heart conditions, we had no choice but to setup payment plans directly with the

19

providers in order to continue to receive care. Again, this caused significant financial hardship in our household."

- Victim M.W. wrote: "[Unpaid medical bills have] caused tremendous physical, mental, and not mention the financial impact this had and is still having on me.  I have hypertension and this has had an intense impact on me."

Even making these victims whole by covering their staggering medical bills cannot undo the harm they endured, especially those being chased by debt collectors while dealing with their own illnesses or those of family members  A meaningful sentence of imprisonment would reflect the seriousness of Stern's offense—particularly its effect on his employees—and the need to punish Stern for his callousness.

### 2.   Stern's Efforts At Concealment Exacerbated His Crime

The seriousness of this offense does not stop at the vast financial and emotional impact it had on Stern's employees, but also includes Stern's futile attempts to hide his crimes, particularly his theft from the Pension Plan.  Indeed, while Stern has taken steps towards restitution, that was certainly not his first—or even second—inclination.  Instead, Stern chose obfuscation at every turn, indicating he knew well that what he was doing was wrong, but chose that path anyway. *First*, he signed a false Form 5500 that used creative accounting (with a $2.6 million bounced check) to hide the transfers to EKC and pretend that the Pension Plan had millions in the bank. *Second*, he later fraudulently reported the transfers as a "loan," using a backdated promissory note that he concocted long after the fact to hide his theft.  *Third*, when confronted by DOL investigators on two different occasions about his transfers to EKC, he repeatedly lied about his connection to

20

EKC and the purpose of the transfers.[3]   And, Stern provided the phony promissory note as supposed evidence of a loan.

These actions do not reflect, as Stern now contends, the actions of someone desperately trying to save a sinking ship, and whose only crime was that he could not admit failure.  Def. Mem. at 21.  Nor can it be explained away by a lack of education, sophistication, or intelligence.  Def. Mem. at 20.  While those narratives may have some relevance to his theft from the Health Plan and the tax withholdings, Stern's attempts at misdirection suggest that his theft from the Pension Plan was more insidious.  False filings, a fraudulent promissory note, and lies to investigators reflect the mind of a knowing criminal actor far more than someone simply robbing Peter to pay Paul.

Even putting his lies aside, the vast complexity of the movement of money from the Pension Plan, through EKC and to other destinations also suggest a baser motive.  Perhaps a desperate man steals money, but a criminal moves money through multiple accounts before it reaches a final destination. If, for example, Stern was simply obsessed with gambling on the lives of others by buying life settlements, Def. Mem. at 28-29, then he could have bought life insurance policies in the Pension Plan as investments.[4]  Instead, these purchases were made through a number of different entities, often after the money was moved through several other unrelated accounts. Nor were many of these "investments" traditional life settlements, in which an investor may purchase a policy from an owner who can no longer make payments.  Instead, most appear to be policies *originated* by Stern.  And while some of those appear to be on his own life or his wife's

---

[3] The Government did not seek an obstruction enhancement because, at the time Stern lied, investigators already had sufficient contrary evidence that his attempts at misdirection were necessarily unsuccessful.

[4] Although, the Government has doubts that "gambling"—to use Stern's own words—on such risky investments would be an appropriate investment for his employees' pensions.

life, others appear to be originated by Stern on unrelated third parties, a fraudulent practice generally prohibited by insurance companies (if they are aware of at the time of inception) that can result in criminal penalties. *See*, *e.g.*, *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015); *United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020).

Moreover, there was nothing about those investments that suggested Stern intended to return any money to the Pension Plan, or that his employees would share in any benefit. Indeed, later in his memorandum, Stern notes that he surrendered "all of the life insurance policies which he bought for the benefit of his family and the Vizhnitz community." Def. Mem. at 34. That explanation—that these policies were for the benefit of family and community rather than his employees—is far more consistent with the facts of the case than the suggestion that he had some unstated intention to share any return with his employees.

At any rate, Stern did not even use the majority of the EKC money to make these risky investments; as discussed above, he also used EKC to fund 1) his own accounts and credit cards; (2) his nursing facilities, including Bridgeport Manor and Rosegarden; (3) other purported charities or causes controlled by Stern, including American Friends of Vizhnitz in Israel; (4) companies that do not appear to have significant, if any, actual business operations; and (5) other individuals, including a relative of Stern. PSR ¶ 17.[5]

Finally, Stern's efforts at restitution came not when he was caught (he initially tried to mislead investigators), but when he had no choice but to face the evidence in front of him. In

---

[5] Stern claims that his furious transfer of money back and forth between the "Toner companies" was an effort to shield assets from creditors. Def. Mem. at 22 n. 16. This explanation is unsatisfying. To the extent that Stern was concerned about BHCC's creditors, the money that moved back and forth to these suspicious businesses did not come from BHCC, but came through other accounts, especially EKC, which were not at risk of being chased by creditors. Moreover, these transfers largely occurred in 2016 or earlier, which is prior to Stern's more acute financial trouble. Finally, the suspicious nature of the "Toner companies" suggests a more insidious purpose.

short, Stern's restitution certainly deserves great credit from the Court in assessing sentence, but it does not undermine the seriousness of the offense nor suggest that Stern had a change of heart during the course of his offense.

3.   Stern Prized His Family and Community Above His Employees

Further exacerbating Stern's crime, and reinforcing his betrayal of the nursing home employees, was his repeated prioritizing of himself, friends, and family over his employees.

Among the false promises Stern made to his employees about their health coverage was that he would only cover eligible employees, that is, employees, spouses, and eligible dependents. PSR ¶ 56. His employees were unaware that their modest payroll deductions, intended to cover their contribution to the Health Plan, would also be needed to offset *fifty* of Stern's family and other associates who were ineligible and made no contribution to the plan. PSR ¶ 57. Stern paid $789,992 in claims for those ineligible participants who made no contribution to their coverage. That was money that should have been used to cover claims of legitimate employees. As to any one of the victims referenced above, that money would have wiped away their medical debt and rid them of the stress and pain that came from Stern's failure to make good on his commitments. That Stern affirmatively chose instead to pay claims for his friends and family at the expense of the employees who earned and paid for that coverage is unconscionable.

The Government certainly acknowledges that financial stress on Stern's nursing homes made it difficult for him to keep up with health claims. Def. Mem. at 26. However, his decision to cover and pay claims for these other individuals was his own decision separate and apart from any financial stressor. As with the Pension Plan—where he transferred employees' money to pay

for, among other things, his own bills and charities—Stern made the decision to prioritize family and friends over his employees.

While Stern's misuse of nursing home funds was most pronounced—and brought the most devastating impact—in the context of the Health Plan, the PSR is also replete with examples of how Stern misused other nursing home funds for the benefit of his friends and family.  PSR ¶¶ 82-95.  Stern's explanation, that in reality he was owed much more than that in rent, Def. Mem. at 23, is a red herring.  Stern and his partners evidently chose a business model in which their owning the property on which the nursing home was located gave the business (and themselves) the greatest chance for success.  That they *could* have caused one of their businesses (the realty company) to charge the other (the nursing home) a higher rent is irrelevant; it appears they made the business decision not to take money out of one pocket and put it in the other.  In any event, it certainly did not justify Stern treating the business like a free benefits agency for his friends and family, and there is no evidence that Stern believed at the time that he was entitled to do so because of his decision not to collect rent.

Stern's prioritization of his community over employees also likely contributed to the failure of the nursing home in yet another way.  When BHCC went into bankruptcy and was taken over by a trustee, the interim CFO reviewed BHCC's vendor agreements and found many "noxious agreements."  She noted that most nursing homes have direct contracts with vendors, but BHCC had been going through middlemen companies for supplies and services, increasing costs by about 75%. According to a former BHCC employee, many of the companies with which Stern contracted

24

were controlled by Stern's friends, and this employee echoed the interim CFO that these companies overcharged BHCC.[6]

Ultimately whether the nursing home was savable by some other administrator, Def. Mem. at 24, is unknowable.  Simply because the trustee could not save it is hardly evidence (Def. Mem. at 24-25) one way or the other.  A bankruptcy trustee cannot be expected to undo years of mismanagement overnight, or to unwind "noxious" vendor agreements and immediately make an unprofitable institution solvent.

### B.  Deterrence and Protection of the Public

Neither specific deterrence nor protection of the public from further crimes of the defendant are prominent considerations in sentencing here.  To be clear, the Government has some concern that Stern does not recognize the extent of the havoc he has wrought on his employees.  Indeed, he still refers to his theft from the Pension Plan as "borrowing," Def. Mem. at 14, despite the evidence showing that it was a straightforward theft that he later papered over with a bogus promissory note.  However, Stern is unlikely to be put in a position again in which he has control over others' money, and thus unlikely to be in a position to reoffend.

Conversely, the Court should consider the general deterrent effect of a sentence here, particularly as regards the tax offenses.  Tax prosecutions—and especially employment tax prosecutions—are relatively rare, and an employer's failure to pay millions of dollars in withholdings is a very serious matter.  The business community must understand that to willfully fail to pay over those withholdings will bring significant punishment. *See* U.S.S.G. Part T, Section

---

[6] This paragraph is based on reports of interview with the interim BHCC CFO and a former accounts payable employee at BHCC.  These reports were previously turned over to defense counsel in discovery and are available for the Court's review upon request.

1, intr. cmt. ("Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.  Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators."); *United States v. Park*, 758 F.3d 193, 201 (2d Cir. 2014) ("With respect to the § 3553(a)(2) factors discussed at the sentencing hearing, general deterrence occupies an especially important role in criminal tax offenses, as criminal tax prosecutions are relatively rare.").

## C. Personal History and Characteristics

Stern's memorandum appropriately devotes significant time to his personal history and characteristics, including his position of prominence within his community, his many acts of charity, his difficult family history, and his current health problems.  All of these factors warrant serious consideration by the Court in locating the appropriate sentence.

*First*, there is little doubt that Stern has played a critical role in his community, providing both economic and moral support for those in need, *see* Def. Mem. at 9-17, although he did so to the detriment of his employees.  Stern explains that he "comes from a community where boundaries between family and community are fluid.  Community members help one another to an extent not often seen in most of modern America."  Def. Mem. at 9.  In that context, Stern deserves great credit for his selflessness, giving of his time and money to members of the community who needed them.  The letters written in support show a man universally revered by friends, family, and acquaintances.  *See* Doc. 42-2.  As one community member explained, "He was a person first and foremost serving the community." Def. Mem. Ex. 2 at 22.  But, tragically, it also appears that this singular dedication to community was concurrently a principal explanation

26

for his fraud. As discussed at length above, the defendant repeatedly placed the interests of his community over those of his employees, for example by siphoning off $4 million in pension money to support (among other things) various religious institutions, funding fringe benefits for friends and family, providing free health insurance to friends and family, and by entering into "noxious" vendor agreements with businesses in the community. While Stern admirably cared for the sick in his community, *see* Def. Mem. at 10, his generosity (or at least fidelity) did not extend to his employees who lost spouses and dependents, leaving them with massive bills that should have been covered by Stern.

Indeed, the vast majority of Stern's letters of support and video testimonials come from community members and family members, and not from employees or residents (or residents' family members). Stern quotes two testimonials related to the nursing homes, one from a contractor who did work at the BHCC, and one from an employee. *See* Def. Mem. at 14. Not surprisingly, though, the overwhelming response from employees, captured in the victim impact statements, has been to condemn Stern's behavior.

In short, Stern's personal ambition to be "one of the most prominent members of his community," Def. Mem. at 33, came at the expense of his employees, who were equally deserving of his compassion but instead found their dedication to their jobs rewarded with theft and fraud.

*Second*, the Court should certainly consider Stern's limited business experience, limited education, possible cognitive deficiencies, and the nursing home industry's downturn in reaching the appropriate sentence. *See* Def. Mem. at 20-22, 34-35. There is little doubt that, at some point, even an experienced businessman would have had difficulty digging BHCC out of the depths to which it had sunk, particularly given the already challenging nursing home business environment.

27

But an ethical businessperson, regardless of experience or intelligence, should have recognized at any point along BHCC's descent that continuing the business was going to cause harm to the people that depended on it.  Stern's psychiatric report (the "Yale Report," Def. Mem. Ex. 1) points to an ingrained "inability to admit failure" to explain Stern's perseverance in the face of likely defeat.  Def. Mem. at 21.  But the Yale Report does not appear to diagnose Stern with a disorder that would have made his choices to embark on a criminal scheme a necessary result.  Instead, it identifies a character flaw—stubbornness in the face of failure—that plagues many people, most of whom do not choose to commit a crime.  Moreover, the inability to admit failure may explain at least partly why Stern continued to operate the nursing homes even as they were failing, but does not excuse or explain his earlier diversion of Pension Plan assets.

*Third*, the Court should consider the impact that Stern's health problems may have during a period of incarceration, and may well find this as a good reason to sentence Stern below the guidelines range.  Def. Mem. at 34-35.  Stern's physician reports a number of comorbidities for which Stern currently takes medication. *See* Doc. 42-6.  The Government understands that Stern is otherwise eligible for the COVID-19 vaccine, but that he has been advised by his doctors not to get the vaccine because he has already recovered from COVID-19.  Thus, the Government does not understand Stern to be using COVID-19 as an independent basis to avoid incarceration here.  Absent a COVID-19 concern, the Court should treat this case as it would any (pre-pandemic) application for a variance based on health conditions.  And, while there is no question that Stern's health poses challenges for him and for the Bureau of Prisons, nothing he has presented suggests that he should be spared prison as a result.  Indeed, Stern has not suggested that any of his conditions—current or historical—are beyond the BOP's medical capabilities.  *See Care Level*

*Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons, May 2019, *available at* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last accessed April 13, 2021).  And while these medical issues may complicate Stern's incarceration, that concern can be addressed through a modest variance at the discretion of the Court, and does not warrant entirely sparing Stern a just punishment in this case.

## V.   **RESTITUTION**

The Government suggests that the Court should treat restitution as to each of the defendant's crimes as follows:

As to the fraud against the Pension Plan, the loss has been effectively repaid, and thus no further restitution is owed.

As to the defendant's tax offense, a restitution order in favor of the IRS should immediately issue in the total amount of $2,461,372.10.  The Government will provide the Court with a proposed order.  The Government will propose a schedule (lump sum and periodic payments) in accord with Stern's resources.  The Government is in the process of researching the availability of Stern's 401K account, which will impact its position on a payment plan, and will provide that information as soon as available.

As to the defendant's fraud against the Health Plan, the Government suggests that the Court indicate its intention to order restitution as required by the plea agreement and 18 U.S.C. § 3663, but defer issuance of the order pending the claims administrator's attempts to settle unpaid claims and obtain releases for all plan participants.  If all participants' debts are satisfied in that way, and providers accept a settlement in full satisfaction of each participant's obligation, then the

Government does not expect to seek additional restitution to cover any discount given by the provider in reaching a settlement.  However, if any claims are not settled in this way, the Government will seek an order from the Court requiring restitution in the remaining amounts.  Put differently, the Government would seek restitution for any participant with unpaid claims that, for whatever reason, the claims administrator did not resolve.

Although this process is likely to take longer than the 90 days allowed in 18 U.S.C. § 3664(d)(5), this Court nonetheless retains the authority to defer restitution as discussed above. Under the Mandatory Victims Restitution Act ("MVRA"), an order of restitution should be entered within 90 days of sentencing. *See* 18 U.S.C. § 3664(d)(5).  However, the Supreme Court and the Second Circuit have made clear that the Court "retains the power to order restitution" outside of the 90-day window so long as there is no prejudice to the defendant and the Court "made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount." *Dolan v. United States*, 560 U.S. 605, 608 (2010) (upholding restitution order issued three months after the 90-day deadline); *see United States v. Gushlak*, 728 F.3d 184, 191-92 (2d Cir. 2013) (upholding restitution order imposed 18-months after sentencing); *see also United States v. Harris,* 813 F. App'x 710, 713 (2d Cir. 2020) (affirming restitution order imposed 15 months after sentencing); *United States v. Illarramendi*, 677 F. App'x 30, 31 (2d Cir. 2017) (affirming restitution order imposed ten months after sentencing); *see also United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004) (allowing restitution order to be imposed after 90 days unless defendant shows prejudice); *United States v. Catoggio*, 326 F.3d 323, 330 (2d Cir. 2003) (same).  Here, Stern's counsel has indicated his intent to agree to the Government's proposal to defer the restitution order, and thus there is no prejudice to him.  Indeed, it is very much in Stern's

interest to avoid another restitution order that he would have to pay on now but that may be satisfied based on the administrator's efforts.  Thus, so long as the Court signals its intent to order restitution for unpaid claims, leaving open only the amount, it may defer that order as proposed. *See Dolan*, 560 U.S. at 608.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the Government urges the Court to sentence the defendant to a meaningful term of imprisonment consistent with the aims of 18 U.S.C. § 3553(a).

Respectfully submitted,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

/s/
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY
Fed Bar No. phv02874
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700
david.novick@usdoj.gov

/s/
NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700
Neeraj.Patel@usdoj.gov

CERTIFICATION OF SERVICE

This is to certify that on April 14, 2020, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


BY:      ____/s/_____
         DAVID E. NOVICK
         ASSISTANT UNITED STATES ATTORNEY